GEORGE SERGEANT, RECEIVER AND TRUSTEE OF COMMERCIAL UNDERWRITERS, v. GOLDSMITH DRY GOODS COMPANY ET AL.

No. 2593. Decided April 28, 1920.

(221 S. W., 259.)

**1.—Demurrer—Pleadings—Agreement of Counsel.**

An agreement of counsel as to issues presented by pleadings determined on demurrer, which is held contradictory and confusing, is disregarded by the court. and the correctness of the rulings is tested by the pleadings themselves regardless of such stipulation. (P. 489).

**2.—Partnership—Voluntary Unincorporated Association.**

A contract by which various persons entered into an association for their own protection against fire losses by a scheme of mutual insurance with liability for losses proportioned to the several amounts contributed expressly made several and not joint, with no object of profit nor community of profits and losses, the concern having no being except in those who were members of it and who were not held out to the world as partners, did not constitute a partnership. As to third persons they were liable as are others who so deal through any form of agency. As between themselves they were liable only as their contracts with each other made them so. (Pp. 489, 490).

**3.—Same.**

As to obligations to third persons, creditors for services rendered or supplies sold to the association and those with whom it had reinsured its risks asserting claim for such re-insurance premiums, the members were jointly and severally liable, each in his application having given express authorization for such re-insurance. (P. 490).

**4.—Same—Liability of Members—Case Stated.**

A voluntary unincorporated association was created by its members for the purpose of protection against losses by fire, each receiving from the common agent of all a policy insuring his property and paying a stated proportion of the customary premium of stock companies for such protection in order to create a fund for the payment of the agent or manager and the common expenses and for re-insuring such risks. This payment was placed to the member's credit. If less was required for such purposes the balance was to be returned to him; if more was required he was to make further payment into the fund, but to the extent only of such stated or customary premium for such protection. A receiver having been appointed for such business, and seeking to enforce against the members their liability for the purpose of winding up its affairs, it is held:

(1) That their relation was not that of partners.

(2) That as to claims for services rendered or supplies sold to the association and for the premiums due for re-insurance the members were each jointly and severally liable.

(3) That upon the claims of members for losses under the policies of insurance issued by the manager and for the manager's services, they were each severally liable, but to the extent only of their contract undertaking, that is for the difference between the proportionate payment each had made and the stated or customary premium of stock companies for the insurance issued to him. (Pp. 486-494).

Questions certified from the court of Civil Appeals for the Fifth District, in an appeal from Dallas County.

. The appeal of Sergeant as receiver from a judgment sustaining a demurrer to his petition resulted in a reversal and remand by the Court of Civil Appeals, 159 S. W., 1036. ′ On motion for a new trial and to certify the questions to the Supreme Court the latter motion was granted, the former being held undetermined to await the answers of the Supreme Court.

*Meador & Davis,* for appellant.—The individuals, firms and corporations composing the commercial underwriters constituted a partnership, and such individuals, firms and corporations are liable as general partners, jointly . and severally. Rev. Stats of Texas (1895), arts. 3583, 1224, 1347; Acts of Thirtieth Leg., 1907, pages 240-1; Ginner's Mutual Underwriters v. Wiley & House, 147 S. W., 629; Benefit Assn. v. Wester, 146. S. W., 1022-4; Burton v. School Furniture Co., 31 S. W., 91; Lumber Co. v. Texas Pine Land Assn., 72 S. W., 875; McGehee v. Powell, 8 Ala., 827-36; Patch Mfg. Co. v. Capless, 63 Atl., 938; Lewis v. Tilton, 19 N. W., 911-12; Lawler v. Murphy, 20 Atl., 457; . Davidson v. Holden, 10 Atl., 513; Babb v. Reed, 28 Am. Dec., 651-52; Shubrick v. Fisher, 2 Desaussure, 142-62; Polk v. Reynolds, 54 Ind., 449; The Swallow, Fed. Cases No. 13665; Pipe v. Bateman, 1 Iowa, 369; Hodgson v. Baldwin, 65 Ill., 532.

The individuals, firms and corporations composing the Commercial Underwriters are liable, jointly and severally, as general partners, for losses accruing under policies of insurance issued by the said Commercial Underwriter to its members. Same authorities, especially, Ginners Mutual Underwriters v. Wiley & House, 147 S. W., 629; Shubrick v. Fisher, 2 Desaussure, 142-62; Lawler v. Murphy, 20 Atl., 457.

The individuals, firms and corporations composing the Commercial Underwriters are liable as general partners, jointly and severally, for the debts due by the Commercial Underwriters for services performed and material furnished and reinsurance assumed, by other parties and concerns, for the use and benefit of the said Commercial Underwriters. Authorities under first proposition, especially, Lumber Co. v. Texas Pine Land Ass'n, 72 S. W., 875; Lewis v. Tilton, 19 N. W., 911-12; Davison v. Holden, 10 Atl., 513; Babb v.

Reed, 28 Am. Dec., 651-2;   Patch Mfg. Co. v. Capeless, 63 Atl., 938-41.

Even though a corporation exceed its powers in entering into partnership relations with others, it cannot escape the liability of a partner where it has received the benefits of the partnership relations. 22 A. & Eng. Ency. of Law, 70;   Indianola v. Railway Co., 56 Texas, 602;   Railway Co. v. Robards, 60 Texas, 552;   Railway Co. v. Gentry, 8 S. W., 102;   Cameron v. Bank, 23 S. W., 334;   Bank v. Greenville Oil & Cotton Co., 60 S. W., 828;   Paper Co. v. Courier Co., 34 N. W., 559;   Chicago Mar. ·Bank v. Ogden, 29 Ill., 248;   Sabine Tram Co. v. Bancroft, 40 S. W., 837-40;   Markowitz v. Greenwall, etc. Co., 75 S. W., 674-81;   Bates v. Carondo Beach Co., 41 Pac., 855.

Parties holding claims against the Commercial Underwriters, whether they be former members of; and holders of policies of insurance in, the Commercial Underwriters;   or whether they be parties holding claims for labor done, or material furnished, or re-insurance assumed, on behalf of the Commercial Underwriters, are not estopped to hold the members of the Commercial Underwriters, liable as partners, for such liabilities. Railway Co. v. Gentry, 69 Texas, 625-636;   Bank v. Oil Co., 60 S. W., 829;   Bond v. Terrell, etc., Mfg. Co., 18 S. W., 692.

*Spence, Knight, Baker & Harris, Alex F. Weisberg, Read & Lawrence*, and *Madden, Truelove & Kimbrough*, for appellees.—An association of individuals not organized for the purpose of accumulating profits in a business sense and distributing same among themselves, but organized for benevolent, social, or charitable purposes, or for mutual fire or life protection, by means of a central fund created by stated deposits, supplemented, as necessary, by limited assessments, is not a partnership in fact. Pecuniary liability upon the members of associations which are not partnerships, can be fastened upon the individual members only by reason of the acts of such individuals or of their agents within the scope of their authority; and the agency must be made out to exist, and to have been exercised, within the scope of the agents' authority—neither is implied from the mere fact of association.   Where the members of an unincorporated mutual fire protection association by written power of attorney define the authority of their agent, termed "Manager," conducting the business of the association, and authorize him only to write policies to members of said association, binding each subscriber severally and only for an amount not exceeding said subscriber's premium, the said agent has no authority to bind any of said members or subscribers by writing policies which purport to impose any further or greater liability, and no further or greater liability can be enforced against any of said members or subscribers by anyone who is himself a member or subscriber, or by anyone else aware of the limitations on the agent's authority.   Bacon on Benefit Societies &

Life Insurance, Par. 27, 28, 30, 35, 112 & 116;  Burt v. Lathrop, 17 N. W., 716;  Brown v. Stoerkel, 41 N. W., 921;  Rankin v. Proeby, 115 N. Y. Supp., 832;  O'Brien v. Grant, 40 N. E., 871; McCabe v. Goodfellow, 133 N. Y., 89;  Branagan v. Buckman, 122 N. Y. Supp., 610;  Primm v. White, 142 S. W., 802;  Payne v. Snow, 59 Am. Dec., 203, 12 Cush., 443;  Niblack on Benefit Societies & Accident Insurance, Par. 79 & 80;  1 Lindley on Partnership, 57; Ostrom v. Grene, 55 N. E., 919;  Meinhart v. Draper, 112 S. W., 702;  Methodist Episcopal Church v. Clifton, 78 S. W., 732;  Industrial Lumber Co. v. Texas Pine Land Association, 72 S. W., 875; Burton v. Grand Rapids Sch. Fur. Co., 31 S. W., 91;  Durbrow v. Eppens, 46 Atl., 582;  Ralli v. White, 47 N. Y. Supp., 197; Hoadley v. Purifoy, 30 L. R. A., 351.

By a partnership as to third parties is meant an estoppel to deny partnership, and there can be no estoppel to deny partnership unless it is shown that there was an actual holding out as partners and that credit was extended on the faith of the holding out as a partnership.  Burrows v. Grover Irrigation Company, 41 S. W., 822; Wallis v. Wood, 7 S. W., 852;  Hahlo v. Mayer, 22 Am. St. Rep., 753; Brown v. Grant, 39 Minn., 404;  Cirkel v. Croswell, 36 Minn., 323; Denithorne v. Hook, 112 P. St., 240.

Even if there exist a partnership, but the articles of partnership limit the liability of the members, or provide for paying the obliga-- tions of the firm out of a specific fund, no greater or other liability can be enforced except and unless estoppel of the members to deny partnership be alleged and shown.  Where a person dealing with an association has knowledge of an agreement limiting the liability of the members, and the Association is not a partnership *inter se* said party cannot hold the members as partners.  Bacon on Benefit Associations & Life Insurance, Par. 112;  Industrial Lumber Company v. Texas Pine Land Association, 72 S. W., 875; Reudel v. Hettirck, 35 N. Y. Sup. Ct., 405;  22 American & English Encyclopedia of Law, 58, 59, 173.

Where a policy written by an unincorporated mutual benefit association contemplates the collection of premiums and assessments from the members of the association, and provides a penalty of forfeiture of membership in the event of default in the payment of such premiums or assessments, such policy is a unilateral contract and imposes no liability to pay any assessment, but the failure to pay any assessment simply forfeits the membership, and the policy and the payment of the assessment simply completes a unilateral contract of insurance which lasts until the next assessment becomes due, and hence an action to recover the assessment cannot be sustained. The receiver of such an association cannot in the interest of creditors of the association recover upon demands upon which the association could not sue, because his rights are no higher than those of the Association.  Cochran v. Boleman, 65 L. R. A., 576;  Clark v.

Schromer, 55 N. E., 785; L'Union St. Jean Baptist v. Osteguy, 65 L. R. A., 158; Gibson v. Megrew, 48 L. R. A., 362; Lehman v. Clark, 43 L. R. A., 468; Chicago Mut. Life Ind. Assn. v. Hunt, 127 Ill., 257.

Corporations formed to do a mercantile business cannot become co-partners with other corporations, nor with individuals; and in the absence of allegations of other charter power than that incidental to the power of doing a mercantile business, a general demurrer should be sustained to the petition alleging a general co-partnership to exist between such corporations and individuals. White v. Pecos Land Co., 45 S. W., 207; Murray v. Exchange Nat'l. Bank, 61 S. W., 508; El Paso Ry. Co. v. Kelly, 83 S. W., 855; Markowitz v. Greenwall, 75 S. W., 74; Corralitos Co. v. Mackey, 72 S. W., 624.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

The certificate of the honorable Court of Civil Appeals may be thus summarized:

The suit was by the appellant as the duly appointed and acting receiver of the Commercial Underwriters of San Antonio and as trustee for certain creditors of that concern, a voluntary unincorporated association for the protection of its membership against loss by fire, against thirteen hundred of its members, seeking to enforce liability in favor of (1) members of the association with claims for losses by fire under policies issued in their favor; (2) creditors of the association for services rendered or supplies sold it; (3) creditors with whom the association had re-insured its risks and asserting claims for such re-insurance premiums; and (4) the manager of the association for his services rendered it.

The allowance by a master of the claims asserted, had been approved by the court in which the receivership was pending.

Only seven of the thirteen hundred defendants were served with process. These appeared and presented a general demurrer to the plaintiff's petition. The demurrer was sustained; and the plaintiff declining to amend, the suit was dismissed. The questions certified arise upon the court's action in sustaining the demurrer.

A common form of application was subscribed by each member of the association in applying for his insurance, and a common form of policy was thereon issued to each member. The application and the policy evidenced the scheme of the association and expressed the contract between the members. Such parts of them as are deemed material by the Court of Civil Appeals are set out in its certificate. From these provisions of the two documents we are asked to determine the nature of the association, the status and the liability of the defendants, as members, for the claims involved.

The application shows that the purpose of the association was not the pursuit of a business for profit. The plan was one for the mutual advantage of those becoming members—called "subscribers,"

and no others; whereby they might obtain fire insurance at what was intended as a low rate—a rate proportioned to the actual experience in losses under the policies issued, and under distinct limitations as to the liability of each member for such losses. Apparently, any person, firm or corporation, approved by the "manager," could become a subscriber or member.

The general supervision of the business was in the hands of a committee of the members, annually elected. The conduct of it was in the hands of a "manager," one C. W. Cannon being named and appointed for that purpose by a common provision in each application. He issued the policies to each member, not in the name of the association, but in his own name. His duties, it was provided, were *"to underwrite* for the subscribers in his own name as manager policies of insurance . . . to re-insure same, to make cancellations, and changes in the amounts and conditions of same; to collect all amounts due from subscribers by virtue thereof; to adjust and settle any loss; and to perform such other acts in relation to such policies as the subscribers could themselves."

Each policy was to be written upon a similar form and at the same rate as required by stock insurance companies. But in lieu of the stated premium in each policy—that is, the customary premium of stock companies for a similar risk—each member as a policy holder was to make with the manager a cash deposit in proportion to the stated premium and "the experience of the exchange"— "the exchange" being but a term to denote those who were at the time of loss members or subscribers, or, in other words, the association—for which amount the member was to receive credit.

If at any time a member's deposit or deposits under policies in force were "expended," or an additional deposit deemed necessary or expedient by the committee, it was to become the member's duty to pay to the trustee (manager) such sum as might be required; such sum, however, to "in no case exceed the amount of the premiums (the stated premiums) on his policy or policies then in force."

Upon the expiration or termination of a member's policy, there was to be refunded to him such portion of his deposit as had not been expended or was not payable "for losses and expenses;" provided, that where a policy was renewed and the member was not maintaining a reserve equal to one-half of his premium, the part of the deposit unexpended might be retained for reserve, but to the member's individual credit, to be returned to him upon his ceasing to be a policy holder.

The remuneration of the manager for his services and those of his clerical force was to be fifteen per cent of each member's premiums. He was authorized to prosecute legal proceedings in connection with any policy issued; to compromise such suits, appear for the members in any suit against them in relation to any policy, and in their name defend or settle it.

One provision in the application was as follows:

"The sum named as each subscriber's premium shall gauge his interest in the business, in that an amount not exceeding under any policy such premium shall be underwritten severally for each subscriber."

The policy of insurance issued in each instance declared it to be a contract between those known as the Commercial Underwriters, (the members each acting through "their attorney in fact, C. W. Cannon") and nominated, "the Exchange," and the assured member, witnessing that the members of the association "severally, each for himself or itself, and not jointly, no one being bound for any other," did thereby guarantee to indemnify the assured against all direct loss by damage or fire, except as in the policy provided, to the property described, to an amount not exceeding Four thousand dollars. Each policy issued contained a recital that the responsibility of each member or subscriber under the policy was "in the same proportion to the entire loss or damage hereunder, which such subscriber's deposit or deposits, at the time of such loss or damage, bear to the aggregate of all deposits then in force."

The certificate of the Court of Civil Appeals recites that before the trial court ruled on the defendant's demurrer, counsel for the parties entered into a stipulation declaring that for the purpose of obtaining a decision of the matters deemed determinative of the case the receiver and trustee abandoned all his allegations seeking to hold any of the defendants except those served with process; all allegations of liability against any of the defendants other than those declaring that because the defendant had each made to the association an application of the tenor stated, and at the time of the accrual of the demands sought to be enforced in the suit had in force policies of fire insurance of the nature shown, they were liable to the plaintiff and those for whom he sued; all allegations of liability except those to the effect that such applications and policies of fire insurance showed that between the defendants there existed a partnership in fact; and all which sought to charge them with liability unless under such applications and policies they were partners in fact.

The questions certified are as follows:

"1. Did the written instruments referred to, in the light of the facts stated, create among defendants a partnership in fact?"

"2. If defendants were partners in fact, was the liability of each partner limited or unlimited? If limited, what was the extent and nature of the liability of each partner?"

"3. If such instruments did not create a partnership in fact, can any other theory of liability of the defendants other than that of a partnership in fact, be considered on this appeal, in view of the pleadings and the stipulations relating to the pleadings above referred to?"

"NOTE: If no other theories can be considered on this appeal than that submitted under Question 1, the remaining question submitted in this certificate need not be answered; but if other theories can be considered, the court submits the following additional question:"

"4. Do the instruments referred to create among the appellees an organization, association or partnership with liability as general partners, and if so are appellees bound to pay any additional sums beyond the amount actually paid in with which to satisfy any of the classes of claims asserted by appellant, and if so to what extent?"

The clauses in the stipulation of counsel as to the abandonment of the plaintiff's allegations are inconsistent if under the applications and policies the defendants are liable other than as partners for any of the classes of claims involved. At one place in the stipulation it is in effect declared that all allegations are abandoned except those asserting the existence of a partnership in fact between the defendants in view of their applications and policies; and that unless thereunder they were partners in fact, they are not liable for any of the claims. This was but to abandon the suit against them unless they were found to be partners. At another place it is in substance recited that all allegations of the plaintiff are abandoned other than those asserting liability, generally, on the part of the defendants because of having made applications for insurance at the hands of the association, of the tenor stated, and their being holders of its policies. This expressed an intention to still insist upon such allegations as declared the defendants to be liable under their applications and policies, regardless of whether under other allegations they were found to be partners.

A contradictory and confusing stipulation of counsel should be disregarded by a court if it stands in the way of a true determination of the rights of the parties. We do not feel called on to fathom the meaning of this ambiguous document, if it has any. It will accordingly be ignored, and the questions in the case determined without reference to it.

It is plain that the members of the association did not constitute a partnership. The concern had none of the elements of a partnership. There was no joint undertaking, no common business. The policies of insurance were not issuable to the public. The business of the association was intimate to only those who as members composed it. Its purpose was merely their mutual protection against fire losses by a scheme of mutual insurance, and their limited liability for such losses was expressly made several and not joint. The object of the concern was not profit. There was to be no community of either profits or losses. There was no holding out of the members as partners. The concern had no being except in those who were members of it. It was not tangible except as they were

tangible. As to third persons, they are therefore liable as other principals are liable who deal with third persons through any form of agency. As between themselves, they are liable as their contracts with each other make them liable. That is the whole of the case on the questions presented. In the language of an eminent author, it is a mere misuse of words to call such an association a partnership. 1 Lindley on Partnership (2nd Amer. Ed.), page 50; 1 Collyer on Partnership, page 47; Wrightington on Unincorporated Associations, Sec. 54, at page 200-2; Niblack on Benefit Societies, Sec. 80; Burt v. Lathrop, 52 Mich., 106, 17 N. W., 716; Brown v. Stoerkel, 74 Mich., 269, 41 N. W., 921; Branagan v. Buckman, 122 N. Y. Supp., 610; Meinhart v. Draper, 133 Mo. App., 50, 112 S. W., 709.

As to third persons dealing with the association and to whom it incurred lawful debts contracted within the powers of whatever agency it employed, that is, claimants falling within the second and third classes, the members of the association, as before stated, are jointly and severally liable as principals. They could not create an organization, give it a name, invite others to sell it supplies or render it services, for instance, for their benefit, and not as principals be liable for such debts. The association was a fiction except as the members stood behind it. They are necessarily liable for debts to third persons incurred in carrying out the purposes for which they were associated. They were the association. Such transactions enured to their joint and several benefit. They should in the same measure pay what is owing upon them. Lewis v. Tilton, 64, Iowa, 220, 52 Am. Rep., 436, 19 N. W., 911; Davison v. Holden, 55 Conn.. 103, 3 Am. St. Rep., 40, 10 Atl., 515; Willcox v. Arnold, 162 Mass., 577, 39 N. E., 414.

As applied to creditors of the third class—those holding claims for re-insurance premiums, it is to be noted that each member in his application gave express authorization for re-insurance of the risks assumed. It was therefore within the authority of the association, as an agency of the members, to contract the indebtedness for such re-insurance premiums.

The approval by the court of the claims of the creditors of the second class carries the inference that this was also true of their claims.

The application of each member and policy issued show that the plan adopted for the payment of all losses under policies and expenses in the conduct of the association's affairs, was the creation of a fund to be derived from the payment by each member, as a policy holder, into the hands of the manager as a trustee of an amount not exceeding, as a maximum for each member, that of the stated premium of his own policy or policies. The contemplation was, as is clearly evident, that the experience of the concern as to losses would not require the payment by each member of the full amount

of his stated premium; and therefore the result would be the creation of a common fund sufficient to liquidate all losses, and, at the same time, protection for each member for less than the ordinary cost of such insurance. Accordingly, only a portion of any member's stated premium was required to be originally paid by him. This was called a deposit. The sum of the deposits made up the fund for the payment of losses. The deposit of each member was placed to his credit. If not absorbed for the payment of losses or expenses, it, or any portion unexpended for those purposes, was to be returned to him upon his ceasing to be a policy holder. In this sense it remained his individual property impressed with what was in the nature of a trust.

The application subscribed by each member was a rather extended document. Its purpose clearly was to advise each member of the full plan of the association and his individual obligation. It is significant that nowhere, either in the application or the policy, was there any express provision made for the means of paying losses other than by the common fund created by the individual deposits of members on the account of their stated premiums.

The application and the policy must be construed together in order to determine the liability of any member for the loss of another member. Together, they constituted the contract of each member with all other members. The provisions of neither are to be ignored. The application was, apparently, the only document subscribed by any member. Its terms are of equal importance with those of the policy in reaching a decision of the question as to a member's liability for losses. Each member signed the application and accepted his insurance fully aware of its provisions.

There are two features of the application which plainly show that under the plan devised no member was to be liable for losses under the policies of other members, beyond the amount of the stated premium on his own policy or policies in force when such losses were sustained.

One is the provision that "if at any time a member's deposit or deposits under policies in force shall be expended or an additional deposit be deemed necessary or expedient by the committee, then it shall be his duty to pay to the trustee such sums as may be required; *provided said sum shall in no case exceed the amount of the premiums on his policy or policies then in force.*"

This is an unequivocal declaration that "in no case"—in no event whatever—should any member be called on to pay, for any purpose, more than the amount of the stated premium of his own policy or policies. It was an express and distinct limitation of each member's liability for all losses of other members under all policies issued, to merely the amount agreed to be paid by him as the stated premium on his own policy or policies.

The other provision is, "The sum named as each subscriber's premium *shall gauge his interest in the business,* in that an amount *not exceeding under any policy such premium* shall be underwritten severally for each subscriber."

This is an explicit statement that the measure of each member's interest in the business was only the amount of the stated premium on his own policy or policies, and therefore such amount was the measure of his liability for the losses of other members, in that any policy issued was to be understood as but a contract whereby each member underwrote the risks of other members to the extent of the amount of the stated premium on his own policy or policies, but not beyond that amount. This is the plain meaning of the provision. No member accepting a policy could have understood it, in the light of this provision, as a contract of different nature, or as imposing on himself for the losses of other members, or on other members for his loss, a different or larger liability.

The essential character of the plan of the insurance is found in these two provisions. They show it to be but a scheme for the individual underwriting by each member of the risks of other members to a limited amount, that is, to the amount only of the stated premium on each member's policy or policies. The amount of the policy issued in each instance, of course, was to be according to the value of the property insured. But each member was to be liable for any loss under a policy only to the extent of "his interest in the business;" for which the policy was underwritten by him, and as so underwritten accepted by the assured member, that is, to the extent of only the amount of the stated premium on his own policy or policies. Nothing else can be gained as the intention of the parties.

These two provisions are therefore to be applied in the interpretation of the clause of the policy reading, "and the responsibility of each subscriber is in the same proportion to the entire loss hereunder, which such subscriber's deposit or deposits, at the time of such loss or damage, bear to the aggregate of all deposits then in force."

This clause, it will be observed, does not say that once the proportion of a member's deposit or deposits to the aggregate deposits is ascertained, his responsibility shall be that part of the loss under the policy. It says that his responsibility shall be in that proportion *to* the loss. The purpose of the clause, in the light of the provisions of the application, was evidently but to define, in the event of loss under the policy, the proportion of a member's unpaid stated premium which it should be his duty, if necessary, to pay for the liquidation of the loss. The amount of his original deposit on his stated premium was, upon the issuance of a policy, already in the common fund and available for the satisfaction of the loss, as would be true of any subsequent deposits required of him. This clause so treats them. His responsibility beyond that is therefore

what the clause deals with—his obligation if the fund as thus constituted should be insufficient to pay the loss.

The plan contemplated only a remote probability of any member being required to make deposits to the full amount of the stated premium on his policies.    Otherwise, the scheme would fail in its intention to provide the members with insurance for less than the ordinary rates.    This being the primary feature of the scheme, what was to be each member's responsibility for the creation of a fund sufficient, in addition to the deposits in hand, to satisfy a particular loss?    That, in our opinion, is what this clause in the policy undertakes to define.    A member's responsibility in such case was to be such proportion of the amount of the stated premium on his policies unpaid, as his deposit bore to the aggregate deposits.

In other words, the plan regarded the unpaid or undeposited amount of a member's stated premium as an outstanding obligation on his part—a resource available for the benefit of the assured member if required for the payment of his loss, but not to be used unless necessary.    And the purpose of this clause was to regulate between the members the proportion of these unpaid balances for whose payment they should, with respect to the particular loss, be responsible.

The full limit of responsibility of each member for all losses under policies / was clearly stated in the application.    It was the amount of the stated premium on his policies, and no more.    "In no case," reads the application, should he be called on to pay beyond that amount.    It is not to be presumed that the purpose of this clause in the policy was to enlarge that liability.    Rather, it should be held to be related in a consistent way to the liability as there expressly and emphatically defined.    This is the sounder construction.    To hold that under this clause in the policy each member was liable in the proportion recited for all losses of all other members, is to ignore entirely this distinct limitation upon each member's liability as declared in the application, and the fundamental theory of the general plan, as well, under which each member, as plainly stated in the other provision of the application, was but an underwriter of other member's risks to the extent only of the stated premium on his own policies.    It would fasten a liability upon the defendants which as reflected by these documents the parties themselves did not intend to create.    Under such a holding the member paying in the larger deposit as a contribution to the common fund—doing most toward affording a common protection, would be responsible for the larger amount of all possible losses, instead of liable only for a just proportion of the unpaid part of his stated premium.    This would impose a manifestly unfair burden.    It should not be cast upon these defendants unless the contract as expressed in these instruments plainly requires it.    The terms of the contract not only do not require it, but refute any such idea.

As to the claim for the services of the manager, no member was liable beyond the stated premium on his policies. The provisions of the application make it plain that beyond such amount no member was to be responsible for the expense of the manager's services. He was a party to the enterprise, doubtless the principal figure in it; and does not stand in the relation to it of a third party.

To the first question certified, we answer "No."

The second question is not answered in view of the answer to the first question.

To the third question we answer "Yes."

The fourth question we answer in this way:

To creditors of the association falling under the second and third classes, that is, creditors with claims for services rendered or supplies sold it, and creditors with claims for premiums for risks of the association re-insured, the defendants are jointly and severally liable as principals. For the payment of the claims of members of the association for losses under policies of insurance issued, and for the payment of the claim for services of the manager rendered the association; that is, for the payment of the claims of creditors of the first and fourth classes, the defendants are severally liable to the extent of the amount of the stated premium on their several policies in force, but not beyond that amount for either or both of such classes of claims.